**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1143**

THE EPISCOPAL CHURCH IN SOUTH CAROLINA,

      Plaintiff - Appellant,

    v.

THE CHURCH INSURANCE COMPANY OF VERMONT,

      Defendant - Appellee,

    v.

OLD ST. ANDREWS EPISCOPAL CHURCH, trading as The Vestries and Churchwardens of The Parish of St. Andrews; ALL SAINTS PROTESTANT EPISCOPAL CHURCH, INC., a/k/a All Saints Episcopal Church, Inc.; EPISCOPAL CHURCH OF OUR SAVIOR; HOLY TRINITY EPISCOPAL CHURCH, a/k/a Trinity Episcopal Church; CHURCH OF THE CROSS, a/k/a Church of the Cross, Inc. and/or Church of the Cross Declaration of Trust; ST. PHILIPS EPISCOPAL CHURCH, a/k/a The Protestant Episcopal Church of The Parish of Saint Philip, in Charleston, in the State of South Carolina; ST. JOHN EPISCOPAL CHURCH; ST. BARTHOLOMEW'S EPISCOPAL CHURCH; CHURCH OF THE HOLY CROSS, STATEBURG, SC, a/k/a The Church of The Holy Cross; THE CHURCH OF THE GOOD SHEPHERD, CHARLESTON, SC, a/k/a Church of the Good Shepherd; THE EPISCOPAL CHURCH OF THE RESURRECTION, SURFSIDE, a/k/a The Church of The Resurrection, a/k/a Epis Ch of the Resurrection; EPISCOPAL CHURCH OF THE HOLY COMFORTER; ST. DAVID EPISCOPAL CHURCH, a/k/a St. David's Church; ST MICHAELS EPISCOPAL CHURCH, a/k/a The Protestant Episcopal Church, The Parish of Saint Michael, in Charleston, in the State of South Carolina and/or St. Michael's Church Declaration of Trust; ST. JUDE'S CHURCH, a/k/a The Vestry and Church Wardens of St. Jude's Church of Walterboro, a/k/a St. Jude's Episcopal Church; VESTRY AND CHURCH WARDENS OF THE EPISCOPAL CHURCH OF THE PARISH OF CHRIST CHURCH, a/k/a Christ Episcopal Church, a/k/a Christ Church Mt.

Pleasant; EPISCOPAL CHURCH OF THE REDEEMER, a/k/a Church of the Redeemer,

Third Party Defendants.

_____

Appeal from the United States District Court for the District of South Carolina, at Charleston. Richard Mark Gergel, District Judge. (2:19−cv−01672−RMG)

_____

Argued: March 9, 2021                                    Decided: May 7, 2021

_____

Before MOTZ, KING, and WYNN, Circuit Judges.

_____

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Motz and Judge King joined.

_____

**ARGUED:** Thomas S. Tisdale, Jr., HELLMAN YATES & TISDALE, Charleston, South Carolina, for Appellant. Melinda Sue Kollross, CLAUSEN & MILLER, PC, Chicago, Illinois, for Appellee. **ON BRIEF:** Jason S. Smith, HELLMAN YATES & TISDALE, Charleston, South Carolina; Kathleen F. Monoc, MONOC LAW LLC, Charleston, South Carolina, for Appellant. Edward K. Pritchard, III, PRITCHARD LAW GROUP LLC, Charleston, South Carolina, for Appellee.

_____

WYNN, Circuit Judge:

Plaintiff Episcopal Church in South Carolina is embroiled in litigation with its former bishop and his adherents. It filed this action against its own insurer—the Church Insurance Company of Vermont—after discovering that the company had reimbursed its adversaries' defense costs. The district court dismissed the complaint for lack of standing. We agree with that assessment and affirm.

I.

A.

In 2012, Bishop Mark Lawrence sought to disaffiliate his South Carolina-based diocese from the Episcopal Church ("the Mother Church"). A number of parishes within the diocese aligned with Lawrence and followed suit (together, "the Disassociated Diocese and Parishes"). But the break wasn't a clean one.

The Mother Church insisted that the diocese remained part of its hierarchy; purported to remove Lawrence as bishop; and selected a new bishop to lead (in its view) the still-associated diocese in South Carolina (Plaintiff here, "the Associated Diocese"). *See vonRosenberg v. Lawrence*, 849 F.3d 163, 166 (4th Cir. 2017). Meanwhile, having declared their independence from the Mother Church, Lawrence and his followers held themselves out as the rightful stewards of the diocese and their respective parishes.

Copious litigation ensued. As relevant here, in January 2013, the Disassociated Diocese and Parishes sued the Mother Church and the Associated Diocese in state court, primarily to clarify the extent of their rights in diocesan and parish property. *See Protestant Episcopal Church in S.C. v. Episcopal Church*, No. 2013-CP-18-00013 (Ct. Common

Pleas, Dorchester Cnty., Jan. 4, 2013). The Mother Church and the Associated Diocese filed counterclaims in that action, then, separately, filed trademark and false-advertising claims in federal court against the Disassociated Diocese and Parishes ("the underlying actions"). *Id.*; *vonRosenberg v. Lawrence*, No. 2:13-587-CWH (D.S.C.). Both cases are ongoing.[1]

B.

Defendant Church Insurance Company of Vermont ("the Church Insurance Company") is a "pure captive insurance company" wholly owned by the Church Pension Fund, a freestanding nonprofit affiliated with the Mother Church. J.A. 231–32. Captive insurance companies operate just like ordinary insurers in nearly every respect. However, their distinguishing feature—what makes them "captive"—is that they may only cover the risks of their parent companies and related entities. *See* S.C. Code Ann. § 38-90-20(A)(1) ("[A] pure captive insurance company may not insure any risks other than those of its parent, affiliated companies, controlled unaffiliated business, . . . or a combination of

---

[1] The federal underlying action is presently pending before this Court for the third time. *See vonRosenberg v. Lawrence*, 412 F. Supp. 3d 612 (D.S.C. 2019) (granting summary judgment for the Mother Church and its affiliates), *appeal docketed*, No. 20-2295 (4th Cir. Dec. 3, 2020). The state underlying action went up to the Supreme Court of South Carolina, returned to the state circuit court on remittitur, and is now pending before the Supreme Court again. *See Protestant Episcopal Church v. Episcopal Church*, 806 S.E.2d 82 (S.C. 2017), *reh'g denied* (Nov. 17, 2017), *cert. denied* (June 11, 2018), *decision on remittitur* (Ct. Common Pleas, Dorchester Cnty., June 19, 2020), *appeal filed* (July 13, 2020).

4

them.").[2] Accordingly, the Church Insurance Company's charter limits its potential underwriting pool to "the [Mother] Church and its provinces, dioceses, parishes, missions, agencies, institutions and other [connected] entities." J.A. 237–38.

Prior to the schism in 2012, the Church Insurance Company issued a Diocesan Program Master Policy for the period of January 1, 2012 to January 1, 2013 ("the Master Policy"). The "named insured" listed on that policy is "Prot Epis Dio So Caro et al"—the Episcopal diocese in South Carolina. *See Church of the Redeemer v. Church Ins. Co. of Vt.*, No. 2:15-cv-2590-PMD, Dkt. No. 1-2 (D.S.C.). But the Master Policy also names fifty-six participant parishes—including the now-Disassociated Parishes—in its declarations. Each participant parish has a corresponding "certificate number." *Id.*; J.A. 20. The record indicates that the certificate numbers represent separate, individualized insurance policies, distinct from the Master Policy, which were issued to the parishes for the same 2012–13

---

[2] We assume without deciding that all of the Associated Diocese's claims are governed by South Carolina law. *See Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 227 n.9 (4th Cir. 2019) (assuming without deciding that Virginia law applied where the appellees did not challenge the appellants' assertion that it did); *Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 330 n.3 (4th Cir. 2005) (assuming without deciding that Virginia law governed where the parties and district court had proceeded on that assumption). Although there was some choice-of-law discussion in the briefing below, the Associated Diocese has clearly proceeded under that assumption on appeal. *See, e.g.*, Opening Br. at 26 (arguing that the Associated Diocese "has standing to assert the four causes of action in the complaint that are recognized under South Carolina common law"). Because we conclude that the Associated Diocese has failed to carry its burden with respect to standing even under its preferred regime, we need not evaluate whether another state's law should, in fact, apply.

period ("the Parish Policies").[3] The parishes paid the premiums on their respective policies directly to the Church Insurance Company.

The Master and Parish Policies all provide liability coverage for "advertising injury," which includes injuries arising out of "infringement of copyright, title, slogan, trademark, or trade name" during the policy period. J.A. 54–55. And along with that coverage, the policies provide for a broad duty to defend, subject to which the Church Insurance Company has "the right and duty to defend a suit seeking damages which may be covered [by the policy]." J.A. 56.

In April 2013, the Disassociated Parishes tendered defense of the aforementioned state-court counterclaims to the Church Insurance Company under their 2012 Parish Policies. The Church Insurance Company initially rebuffed the requests, prompting the Disassociated Parishes to file a declaratory judgment action against it. That case was ultimately resolved by a joint stipulation of dismissal with prejudice. And since that time, the Church Insurance Company has been reimbursing the Disassociated Parishes' defense costs in connection with both the state and federal underlying actions.

C.

The Associated Diocese initiated this suit against the Church Insurance Company in June 2019. Its complaint alleged four causes of action: (1) breach of contract; (2) bad faith; (3) breach of fiduciary duty; and (4) aiding and abetting breach of fiduciary duty. But

---

[3] The diocese likewise has a certificate number, which is the same as the Master Policy number.

the general thrust of the lawsuit is that the Church Insurance Company funded the Disassociated Parishes' defense costs when it shouldn't have, thereby prolonging the underlying actions to the Associated Diocese's detriment.

In November 2019, the district court expressed "concerns regarding [the Associated Diocese's] standing to bring a lawsuit against [the Church Insurance Company]" and ordered briefing on the subject *sua sponte*. J.A. 181–82. The parties complied. And two months later, the court dismissed the case for lack of standing,[4] concluding, *inter alia*, that the Associated Diocese had failed to show "any injury" that was "traceable" to the Church Insurance Company's reimbursements.[5] J.A. 280. The Associated Diocese now appeals.

## II.

We review a district court's dismissal for lack of standing de novo. *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019). As the party invoking federal

---

[4] The district court did not indicate whether it meant to dismiss this case with or without prejudice. However, as we've previously explained, "[a] dismissal for lack of standing—or any other defect in subject matter jurisdiction—must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits." *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013). Accordingly, we affirm with the understanding that the dismissal is without prejudice.

[5] As an alternative and independent basis for dismissal, the district court concluded that the Associated Diocese lacked prudential standing, as it had "solely attempt[ed] to raise another entity's legal rights, namely that of [the Church Insurance Company's parent]." J.A. 280. But because we agree that Article III standing is absent here, we do not address prudential standing.

jurisdiction, the Associated Diocese has the burden of demonstrating standing for each of its four claims. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

Because the district court dismissed this case at the pleadings stage, "we accept as true all material allegations of the complaint and construe the complaint in favor of the [Associated Diocese]." *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013). However, we need not accept allegations "that constitute nothing more than 'legal conclusions' or 'naked assertions.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). And we may consider authentic, extrinsic evidence that is integral to the complaint, as well as matters of public record.[6] *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

III.

Article III requires a live case or controversy over which federal courts may exercise jurisdiction. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To satisfy that "irreducible constitutional minimum," a plaintiff must have "(1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan v. Defs. of Wildlife*, 504

---

[6] The Associated Diocese contends that the district court engaged in "premature[]" factfinding by determining what the "operative" documents were before formal discovery. *See* Opening Br. at 39. We note that the district court stated in its dismissal order that it had relied "solely on the allegations and representations by [the Associated Diocese]." J.A. 279. But regardless, when a court evaluates subject-matter jurisdiction under Rule 12(b)(1), "[it] is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

U.S. 555, 560–61 (1992)). Our focus here is on the first two criteria—injury and traceability.

From an Article III standpoint, it can't be that a party is "injured" whenever its litigation opponent puts up a robust, well-financed defense. A key purpose of standing, after all, is to "preserve[] the vitality of the adversarial process." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Lujan*, 504 U.S. at 581 (Kennedy, J., concurring)). The Associated Diocese appears to recognize as much because, in each of its four claims, it alleges not just that the Church Insurance Company reimbursed the Disassociated Parishes, but that it betrayed some contractual or fiduciary obligation by doing so. Even so, we agree with the district court that the Associated Diocese has failed to demonstrate Article III standing for any of its claims, each of which we address in turn.[7]

## A.

In its first claim, the Associated Diocese alleges that the Church Insurance Company breached contractual duties under the Master Policy by funding the Disassociated Parishes' litigation defenses.

The Associated Diocese argues that it has standing to pursue this claim on two bases. First, it asserts that applicable captive insurance laws and the Church Insurance Company's

---

[7] In the federal underlying action, *vonRosenberg v. Lawrence*, the district court twice attempted to abstain. We vacated and remanded both times. *See* 781 F.3d 731 (4th Cir. 2015); 849 F.3d 163 (4th Cir. 2017). Noting those outcomes, the Associated Diocese accuses the district court of having "effectively abstained" here, again improperly. *See* Opening Br. at 34–38. But that characterization is misplaced. In raising the issue of standing, the district court was policing its own subject-matter jurisdiction, as it is required to do. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 480 (4th Cir. 2005).

corresponding obligations are implicitly woven into the fabric of the Master Policy. The Master Policy says nothing about whom the Church Insurance Company may or may not insure. But the thinking goes that, because all insurance contracts are "presumed to have been made with reference to the law of the land, [which] enter[s] into and form[s] a part of the contract," *Export Leaf Tobacco Co. v. Am. Ins. Co.*, 260 F.2d 839, 845 (4th Cir. 1958), the Church Insurance Company's duties as a captive insurer—specifically, the restrictions against insuring unaffiliated entities—are incorporated into the Master Policy "as if set forth verbatim therein," *see* J.A. 19–20. Put another way: by reimbursing the Disassociated Parishes, the Church Insurance Company breached its requirements as a captive insurer *and* its duties under the Master Policy.

The problem for the Associated Diocese is that the Church Insurance Company does not appear to have strayed beyond its limitations as a captive insurer. The 2012 Master and Parish Policies were all issued *before* the breakaway, when the now-Disassociated Parishes were still insurable "affiliates" of the Mother Church. That the Disassociated Parishes are no longer affiliated with the Mother Church is of no matter—the Associated Diocese points to nothing in the captive insurance laws or the Church Insurance Company's charter that indicates that the act of disaffiliation halts or voids a properly issued policy before the end of its coverage period. Simply put, the Associated Diocese argues that it has been injured by the Church Insurance Company's decision to improperly defend its rivals, but there does not appear to be anything improper about the insurer's actions. The Associated Diocese has therefore failed to show an injury that is fairly traceable to a breach of the captive insurance rules.

10

The Associated Diocese also argues that it has standing "as a trust beneficiary" of the Parish Policies themselves. Opening Br. at 24, 26. According to the complaint, the Associated Diocese holds a beneficial trust interest in certain parish property now in the Disassociated Parishes' possession, as well as in "insurance policies protecting such property." J.A. 22. The scope of that purported trust interest is presently being litigated in state court.[8] But in any event, the Associated Diocese asserts that it is the beneficial owner of any "receivable insurance proceeds" that might flow from the Parish Policies, and that insurance payments made to the Disassociated Parishes are therefore "misdirected." J.A. 22–24.

However, the Associated Diocese does not actually allege that the Church Insurance Company has misdirected "proceeds" in which it might conceivably have a trust interest. Though the complaint repeatedly uses the general term "insurance proceeds," the Associated Diocese has since clarified that "[t]he payments at issue in [the] complaint are specifically for the defense costs of the Disassociated Parishes in litigation." J.A. 147. Those payments go straight to defense attorneys—by their nature, they can never be held

---

[8] The Associated Diocese insists that the Supreme Court of South Carolina "awarded [it] and [the Mother] Church all trust property of the local historic diocese and 29 of the 36 parishes" at issue in *Protestant Episcopal Church*, 806 S.E.2d 82 (S.C. 2017). ECF No. 25. However, that decision—in which each of the five Justices wrote separately— was hardly clear-cut. On remittitur, the state circuit court, doing its best to parse the myriad opinions from above, found that the Associated Diocese has *no trust interest* in property possessed by the Disassociated Parishes. *See Protestant Episcopal Church v. Episcopal Church*, No. 2013-CP-18-00013 (Ct. Common Pleas, Dorchester Cnty., June 19, 2020). The Associated Diocese has appealed that decision to the South Carolina Supreme Court.

11

in trust for the Associated Diocese. And so, again, the Associated Diocese has failed to allege any injury fairly traceable to a breach of the Master Policy.

B.

In its second claim, the Associated Diocese alleges that "[the Church Insurance Company] breached an implied covenant of good faith and fair dealing" and "acted unreasonably and in bad faith" when it funded the Disassociated Parishes' defense costs. J.A. 30. This claim is founded on the same premises as the breach-of-contract claim— implicit incorporation of captive-insurer duties into the relevant policies, and the Associated Diocese's alleged trust interest in parish property. But the Associated Diocese lacks standing to bring it because, like the breach-of-contract claim, it has made no showing that the Church Insurance Company actually breached any captive insurance laws, nor has it made a showing that any payments were directed contrary to the Associated Diocese's alleged trust interest.

C.

That brings us to the third claim, in which the Associated Diocese alleges that the Church Insurance Company violated duties of "loyalty and care to insure risks . . . and to properly process insurance claims only for the benefit of [the Mother Church] and its affiliates." J.A. 31.

The Associated Diocese contends that these duties arise from a "special confidence" between it and the Church Insurance Company, i.e. that the Church Insurance Company understands and appreciates (1) the Associated Diocese's "role as a diocese in [a] hierarchical organization" and "its trust interests in diocesan and parish property"; and (2)

12

that its own "mission and exclusive purpose is to protect such interests." Opening Br. at 30–31.

South Carolina recognizes the potential for fiduciary duties to arise between insurers and insureds in limited cases. *See, e.g.*, *Harleysville Grp. Ins. v. Heritage Cmtys., Inc.*, 803 S.E.2d 288, 298 (S.C. 2017). But we agree with the district court that the Associated Diocese's allegations, without more, are insufficient to support the type of fiduciary duty that the Associated Diocese suggests exists—namely, one requiring the Church Insurance Company to elevate the interests of one insured affiliate (the Associated Diocese) over those of other insured affiliates (the now-Disassociated Diocese and Parishes). *Compare Pitts v. Jackson Nat'l Life Ins. Co.*, 574 S.E.2d 502, 509 (S.C. 2002) ("[A] fiduciary relationship, if one is found to exist, flows not from the mere fact of an insurance relationship between the parties; something more than the mere fact of an insurance relationship is required to establish a fiduciary relationship." (quoting 14 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 198:7 (3d ed. 1999))), *with Harleysville Grp. Ins.*, 803 S.E.2d at 298 ("[W]hen an insurer controls the defense of the action against its insured, a high fiduciary duty [i]s owed by the insurer to the insured." (quotation marks omitted)).

As emphasized in the complaint, the Church Insurance Company's stated mission is to insure "various property and casualty risks of [the Mother Church] and its provinces, dioceses, parishes, missions, agencies, institutions and other [connected] entities." J.A. 19–20. There is nothing implicit or explicit in that mission statement or the Master Policy which suggests that the Church Insurance Company has the duty—or the right—to decline

to defend a parish to which it issued a valid policy because said parish is in litigation with a diocese. Thus, as with its contract and bad-faith claims, the Associated Diocese has failed to demonstrate an injury corresponding to a breach of any fiduciary duty it may be owed as an insured.

D.

Finally, the Associated Diocese alleges that the Church Insurance Company has "aided and abetted" the Disassociated Diocese and Parishes in breaching fiduciary duties "arising from *their* possession . . . and use of diocesan and parish property held in trust for [the Associated Diocese] and [the Mother Church]." J.A. 32–33 (emphasis added).

Under South Carolina law, a party may be held liable for its "knowing participation" in another party's breach of a fiduciary duty. *Bennett v. Carter*, 807 S.E.2d 197, 200 (S.C. 2017). "Participation" in this context ordinarily means providing "substantial assistance" to the party in breach—e.g., writing bad checks; making misleading statements to shareholders; or hiding evidence of wrongdoing. *See generally* Restatement (Second) of Torts § 876 (Am. L. Inst. 1979). But under the Associated Diocese's theory, any insurer (or, for that matter, any attorney) that defends a party alleged to have breached a fiduciary duty could be sued for "aiding and abetting" that breach.

Like the district court, we are skeptical that the Supreme Court of South Carolina would embrace a conception of "knowing participation" that would effectively prevent a party accused of breaching a fiduciary duty from mounting a legal defense. But regardless, the injury alleged in relation to the "aiding and abetting" claim—the continued misuse and dispossession of trust property *by the Disassociated Diocese and Parishes*—is not "fairly

14

traceable" to the Church Insurance Company's conduct for Article III purposes. *See Air Evac EMS Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2018) ("While the defendant's conduct need not be the last link in the causal chain, the plaintiff must be able to demonstrate that the alleged harm was caused by the defendant, as opposed to the independent action of some third party not before the court." (quotation marks omitted)).

The United States Supreme Court's decision in *Simon v. Eastern Kentucky Welfare Rights Organization* is instructive. There, the Court considered whether low-income individuals had standing to sue the IRS for giving favorable tax breaks to hospitals that did not serve indigent patients to the full extent of their ability. *See* 426 U.S. 26, 28–29 (1976). The Court held that the plaintiffs did not have standing, in large part because the causal connection between the alleged harm (not receiving care) and the challenged conduct (providing a tax incentive) was too attenuated—it was "purely speculative" whether removal of the challenged tax breaks would cause the hospitals to alter the scope of the services they provided. *Id.* at 40–46.

Here, common sense says that the Church Insurance Company's reimbursements have aided the Disassociated Parishes in resisting the claims against them. But whether the Disassociated Parishes would have simply rolled over without Church Insurance Company funding is entirely speculative.

IV.

In sum, the Associated Diocese lacks standing to pursue any of its four claims against the Church Insurance Company. The judgment of the district court is therefore

*AFFIRMED*.

15