**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 21-1839**

───────────────

WILD VIRGINIA; VIRGINIA WILDERNESS COMMITTEE; UPSTATE FOREVER; SOUTH CAROLINA WILDLIFE FEDERATION; NORTH CAROLINA WILDLIFE FEDERATION; NATIONAL TRUST FOR HISTORIC PRESERVATION; MOUNTAINTRUE; HAW RIVER ASSEMBLY; HIGHLANDERS FOR RESPONSIBLE DEVELOPMENT; DEFENDERS OF WILDLIFE; COWPASTURE RIVER PRESERVATION ASSOCIATION; CONGAREE RIVERKEEPER; THE CLINCH COALITION; CLEANAIRE NC, f/k/a CLEAN AIR CAROLINA; CAPE FEAR RIVER WATCH; ALLIANCE FOR THE SHENANDOAH VALLEY; ALABAMA RIVERS ALLIANCE,

   Plaintiffs – Appellants,

v.

COUNCIL ON ENVIRONMENTAL QUALITY; BRENDA MALLORY, in her official capacity as Chair of the Council on Environmental Quality,

   Defendants – Appellees,

and

AMERICAN FARM BUREAU FEDERATION; AMERICAN PETROLEUM INSTITUTE; AMERICAN ROAD AND TRANSPORTATION BUILDERS ASSOCIATION; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

   Intervenors/Defendants – Appellees,

and

AMERICAN FUEL AND PETROCHEMICAL MANUFACTURERS; FEDERAL FOREST RESOURCE COUNCIL; AMERICAN FOREST RESOURCE COUNCIL; INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA; NATIONAL CATTLEMEN'S BEEF ASSOCIATION,

Intervenors/Defendants.

------------------------------

AMMD PINE GROVE PROJECT; IOWA CITIZENS FOR COMMUNITY IMPROVEMENT; ANIMAL LEGAL DEFENSE FUND; INSTITUTE FOR AGRICULTURE AND TRADE POLICY; WATERKEEPERS ALLIANCE, INC.; WATERKEEPERS CHESAPEAKE, INC.; HUMANE SOCIETY OF THE UNITED STATES,

Amici Supporting Appellants.

Appeal from the United States District Court for the Western District of Virginia, at Charlottesville.  James P. Jones, Senior District Judge.  (3:20-cv-00045-JPJ-PMS)

Argued:  October 26, 2022                    Decided:  December 22, 2022

Before AGEE and WYNN, Circuit Judges, and MOTZ, Senior Circuit Judge.

Affirmed by published opinion.  Judge Wynn wrote the opinion, in which Judge Agee and Senior Judge Motz joined.

**ARGUED:**  Kimberley Hunter, SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina, for Appellants.  Allen M. Brabender, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Michael B. Kimberly, MCDERMOTT, WILL & EMERY, LLP, Washington, D.C., for Intervenor.  **ON BRIEF:** Sam Evans, Nicholas S. Torrey, Megan Kimball, Alex Hardee, SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina, for Appellants.  Jean Williams, Deputy Assistant Attorney General, Clare Boronow, Gregory M. Cumming, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Justin Pidot, General Counsel, Amy Beth Coyle, Deputy General Counsel, COUNCIL ON ENVIRONMENTAL QUALITY, Washington, D.C., for Appellees Council on Environmental Quality and Brenda Mallory.  Tara S. Morrissey, Tyler S. Badgley, UNITED STATES CHAMBER LITIGATION CENTER, Washington, D.C., for Appellee Chamber of Commerce of the United States of America.  Charles Seidell, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Intervenors-Defendants-Appellees.  Nick Goldstein, AMERICAN ROAD & TRANSPORTATION

2

BUILDERS ASSOCIATION, Washington, D.C., for Appellee American Road & Transportation Builders Association. Ellen Steen, Travis Cushman, AMERICAN FARM BUREAU FEDERATION, Washington, D.C., for Appellee American Farm Bureau Federation. Wyatt G. Sassman, UNIVERSITY OF DENVER ENVIRONMENTAL LAW CLINIC, Denver, Colorado, for Amici Iowa Citizens for Community Improvement, et al. Cale Jaffe, Environmental Law and Community Engagement Clinic, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Amicus The AMMD Pine Grove Project.

WYNN, Circuit Judge:

Plaintiffs, a group of seventeen environmental organizations, sued the Council on Environmental Quality in July 2020 related to the Trump Administration's promulgation of a final rule that affected how federal agencies would conduct reviews under the National Environmental Policy Act.

The wisdom of those policy changes is not before us. As a matter of fact, we have no license to consider the merits of the challenge to the rulemaking. The only question before us is whether the district court had jurisdiction to consider this particular challenge, as Plaintiffs have chosen to frame it, at this stage. We agree with the district court that it did not.

I.

A.

In 1969, Congress passed the National Environmental Policy Act ("NEPA") in recognition of "the profound impact of man's activity on the interrelations of all components of the natural environment" and with the goals of "declar[ing] a national policy which will encourage productive and enjoyable harmony between man and his environment," "promot[ing] efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man," and "enrich[ing] the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. §§ 4321, 4331(a). Considering those principles, Congress asserted that "it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate

4

Federal plans, functions, programs, and resources to the end that the Nation may" properly balance environmental, health, historic, economic, and other concerns. *Id.* § 4331(b).

Unlike other environmental statutes of the era, however, NEPA does not contain substantive environmental requirements or direct particular outcomes. Rather, the heart of NEPA is a procedural requirement that "all agencies of the Federal Government" must include a "detailed" environmental impact statement "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." *Id.* § 4332(2)(C). These environmental impact statements serve as "democratic decisionmaking tool[s]" that provide information to both the agencies undertaking them and the general public. *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 603 (4th Cir. 2012) (quoting *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 n.24 (9th Cir. 2010)). "The informational role of an [environmental impact statement] is to give the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process, and, perhaps more significantly, provide a springboard for public comment in the agency decisionmaking process itself." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (internal quotation marks, alterations, and citation omitted).

To further these goals, NEPA established the Council on Environmental Quality ("CEQ") within the Executive Office of the President. 42 U.S.C. § 4342. CEQ has the authority to promulgate regulations implementing NEPA. *See* 40 C.F.R. § 1500.1(b) (citing 42 U.S.C. § 4332(2)). Other agencies—those that will actually be undertaking NEPA

5

reviews related to proposed federal actions—then promulgate their own regulations, consistent with CEQ's. *See* 40 C.F.R. § 1507.1, .3.

Before 2020, CEQ's NEPA regulations had remained virtually unchanged since 1978. *Wild Va. v. Council on Env't Quality*, No. 3:20CV00045, 2020 WL 5494519, at *2 (W.D. Va. Sept. 11, 2020) (noting two "relatively minor" amendments); *see* National Environmental Policy Act—Regulations, 43 Fed. Reg. 55978 (Nov. 29, 1978); Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304, 43304 (July 16, 2020) ("CEQ has not comprehensively updated its regulations since their promulgation in 1978, more than four decades ago.").

In August 2017, President Trump issued Executive Order 13807, instructing CEQ to provide ways "to enhance and modernize the Federal environmental review and authorization process." Exec. Order No. 13807, 82 Fed. Reg. 40463, 40467 (Aug. 15, 2017). The following year, CEQ published an advance notice of proposed rulemaking, seeking public input on potential changes to the NEPA rules. Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, 83 Fed. Reg. 28591 (June 20, 2018). CEQ received more than 12,500 comments related to this notice. *See Rulemaking Docket: Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act*, Council on Env't Quality, https://www.regulations.gov/docket/CEQ-2018-0001/comments (last visited Dec. 14, 2022) (saved as ECF opinion attachment).

In January 2020, CEQ published a notice of proposed rulemaking laying out significant proposed changes to the NEPA regulations. Update to the Regulations

Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 1684 (Jan. 10, 2020). For example, CEQ proposed to eliminate the requirement that cumulative effects be considered in NEPA analyses, *id.* at 1729; to set new time and page limits on environmental impact statements, *id.* at 1699–1700; to remove loans and loan guarantees from the definition of "major Federal action," thus excluding them from NEPA review, *id.* at 1709; to set stricter requirements for public comments on environmental impact statements, *id.* at 1703–04; and to establish that the CEQ regulations set a ceiling for NEPA reviews, such that other agencies were not to "impose additional procedures or requirements" for such reviews, *id.* at 1706. CEQ received more than 1.1 million comments on the proposed rulemaking. *See Proposed Rule: Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, Council on Env't Quality, https://www.regulations.gov/document/CEQ-2019-0003-0001 (last visited Dec. 14, 2022) (saved as ECF opinion attachment). "Many commenters were opposed to CEQ's rulemaking for a variety of reasons[.]" *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act: Final Rule Response to Comments*, Council on Env't Quality (June 30, 2020) (available at J.A. 1210).[1]

On July 16, 2020, CEQ promulgated the final rule updating the NEPA regulations, which closely mirrored the proposed rule ("2020 Rule"). 85 Fed. Reg. 43304. It adopted each of the proposals noted above. *See id.* at 43314, 43324 (time and page limits), 43333 (comments), 43340 (ceiling), 43343 (cumulative effects), 43348 (loan guarantees). The

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

rule set an effective date of September 14, 2020, and applied "to any NEPA process begun after" that date. *Id.* at 43372 (codified at 40 C.F.R. § 1506.13). It also provided that agencies could opt to apply the 2020 Rule "to ongoing activities and environmental documents begun *before* September 14, 2020." *Id.* at 43372–73 (codified at 40 C.F.R. § 1506.13) (emphasis added). The 2020 Rule further directed each federal agency to "develop or revise, as necessary, proposed procedures to implement the regulations in this subchapter, including to eliminate any inconsistencies with the regulations in this subchapter," within one year of the Rule's effective date. *Id.* at 43373 (codified at 40 C.F.R. § 1507.3).

## B.

Plaintiffs filed their complaint on July 29, 2020—shortly after the final rule was promulgated, and several weeks before it took effect. They brought ten claims against CEQ: nine claims of Administrative Procedure Act violations in the rulemaking process, and one allegation that some changes to the rule fell outside CEQ's rulemaking authority. They requested that the court vacate and set aside the 2020 Rule and reinstate the previous version of the rule.

Plaintiffs' complaint raised concerns with numerous aspects of the 2020 Rule. For example, they alleged that the rule would exempt some categories of activities from NEPA review entirely, such as Concentrated Animal Feeding Operations, which would be excluded because the 2020 Rule no longer required review "where the trigger for NEPA compliance is federal loan and loan guarantees." J.A. 170. They pointed to changes that they were concerned would weaken NEPA environmental review, such as that the 2020

8

Rule altered "the threshold for what is considered a major federal action requiring preparation of an [environmental impact statement]" and the requirements for reviewing alternatives; eliminated the requirement to consider cumulative effects, as well as the distinction between direct and indirect effects; created "strict causation requirements for limiting which environmental effects may be considered"; and allowed agencies to rely on old scientific and technical research in their analyses. J.A. 171. They objected to the 2020 Rule's allowance for permit applicants "to expend resources before beginning the NEPA process, despite the well-documented evidence that the NEPA process is significantly more effective the earlier it begins." J.A. 173. Finally, they alleged that the 2020 Rule "places demanding requirements on the specificity of comments from the public" and "imposes arbitrary time and page limits that agencies must meet." *Id.* They further noted that the new comment requirements included an exhaustion requirement, that is, that "[c]omments and objections of any kind not provided within the comment period(s) shall be considered unexhausted and forfeited." 40 C.F.R. § 1503.3(b).

Shortly after filing their complaint, Plaintiffs moved for a preliminary injunction, attaching fifty-one declarations in support of their motion and one more attached to their reply brief. The declarations were provided by a variety of stakeholders, including executive directors of Plaintiffs' organizations, lawyers, scientists, a medical doctor, community organizers, and small business owners. Each followed more or less the same pattern: they explained their interest in the local environment and how they are involved in advocating for it, including, in many instances, previously relying on NEPA reviews; they noted their specific concerns about the 2020 Rule; and they explained how they expected

9

the 2020 Rule would lead to harmful environmental effects and how those effects would impact their recreational, aesthetic, health-related, and economic interests.

CEQ and a number of industry groups that the district court permitted to intervene as defendants moved to dismiss the complaint for lack of jurisdiction. After holding a hearing, the district court denied the motion for a preliminary injunction a few days before the 2020 Rule took effect. *Wild Va.*, 2020 WL 5494519, at \*1. Soon thereafter, the court denied the motions to dismiss with little explanation. The parties then cross-moved for summary judgment. Plaintiffs attached one more declaration to their motion for summary judgment, for a total of fifty-three declarations.

On the day he was sworn into office, President Biden issued an Executive Order revoking Executive Order 13807 and ordering "all executive departments and agencies . . . to immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years" that, in the Biden Administration's view, conflicted with federal environmental-policy goals. Exec. Order No. 13990, 86 Fed. Reg. 7037, 7037 (Jan. 20, 2021); *see id.* at 7042. On the same date, the White House issued a "Fact Sheet" specifically listing the 2020 Rule as an agency action that was to be reviewed in accordance with Executive Order 13990. *Fact Sheet: List of Agency Actions for Review*, White House (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/20/fact-sheet-list-of-agency-actions-for-review/ (saved as ECF opinion attachment).

CEQ thus ceased defending the merits of the 2020 Rule in court, at least while it reconsidered the Rule.[2] In a declaration filed in the district court in March 2021, a member of CEQ stated that the Biden Administration had "substantial concerns about the effects of the 2020 Rule on public health, the nation's land, water, and air quality, communities that have been historically marginalized and overburdened by pollution, the ability of citizens to have their voices heard in federal decision-making processes, and other issues, including the process by which the 2020 Rule was promulgated and the lawfulness of aspects of the 2020 Rule." J.A. 824.

Considering CEQ's change of heart regarding the 2020 Rule, CEQ moved to stay the case for sixty days to allow the new administration time to review the action, or to remand the matter to the agency without vacating the rule. Plaintiffs opposed both motions, and both were unsuccessful.[3] And, whatever CEQ thought about the 2020 Rule on the merits, it continued to argue that the court lacked jurisdiction based on standing and ripeness.

---

[2] The industry-group intervenors continued to defend the 2020 Rule on the merits.

[3] By contrast, in every other similar challenge of which we are aware, the plaintiffs consented to CEQ's request for a stay, and the case has been stayed in the district court since February 2021. *See* Stay Order, *Env't Just. Health All. v. Council on Env't Quality*, No. 1:20-cv-06143-JLR (S.D.N.Y. Feb. 16, 2021); Stay Order, *California v. Council on Env't Quality*, No. 3:20-cv-06057-RS (N.D. Cal. Feb. 12, 2021); Stay Order, *Alaska Cmty. Action on Toxics v. Council on Env't Quality*, No. 3:20-cv-05199-RS (N.D. Cal. Feb. 12, 2021); Stay Order, *Iowa Citizens for Cmty. Improvement v. Council on Env't Quality*, No. 1:20-cv-02715-TJK (D.D.C. Feb. 9, 2021); *see also* National Environmental Policy Act Implementing Regulations Revisions, 86 Fed. Reg. 55757, 55758 & n.13 (Oct. 7, 2021) (noting these four challenges, plus the instant one).

In April 2021, the district court held another hearing on the parties' motions for summary judgment, after which it dismissed the case without prejudice for lack of jurisdiction. *Wild Va. v. Council on Env't Quality*, 544 F. Supp. 3d 620, 642 (W.D. Va. 2021). The court agreed with CEQ that Plaintiffs lacked standing to challenge the 2020 Rule and that any such challenge was not yet ripe anyway. *Id.* Plaintiffs timely appealed.

C.

A few days after the district court rendered its decision, CEQ published an interim final rule to "extend[] the deadline by two years for Federal agencies to develop or revise proposed procedures for implementing the procedural provisions" of NEPA. Deadline for Agencies To Propose Updates to National Environmental Policy Act Procedures, 86 Fed. Reg. 34154, 34154 (June 29, 2021); *see* 40 C.F.R. § 1507.3(b) (allowing agencies three years after September 14, 2020, rather than just one year, to propose revisions to their regulations). In that rulemaking, CEQ represented that it was "engaged in an ongoing and comprehensive review of the 2020 Rule for consistency with the nation's environmental, equity, and economic priorities; to evaluate the process CEQ used in developing the 2020 Rule; and to consider whether the 2020 Rule properly and lawfully interprets and implements NEPA." 86 Fed. Reg. at 34155.

CEQ issued a notice of proposed rulemaking on October 7, 2021, proposing some changes to the 2020 Rule. National Environmental Policy Act Implementing Regulations Revisions, 86 Fed. Reg. 55757 (Oct. 7, 2021). After receiving nearly 100,000 comments, CEQ promulgated the final revised rule in April 2022, effective May 20, 2022 ("2022 Rule"). National Environmental Policy Act Implementing Regulations Revisions, 87 Fed.

Reg. 23453, 23453, 23455 (Apr. 20, 2022). CEQ called the 2022 Rule its "Phase 1 rulemaking," and represented that it intended to propose additional, "more comprehensive" revisions in a "Phase 2 rulemaking" shortly. *Id.* at 23455. In a recent filing in another case, CEQ indicated that its "present goal is to publish the Phase 2 [notice of proposed rulemaking] and proposed rule in the Federal Register for public review and comment in January 2023." Joint Status Report at 5, *California v. Council on Env't Quality*, No. 3:20-cv-06057-RS (N.D. Cal. Nov. 3, 2022).

The 2022 Rule makes three primary changes to the 2020 Rule. First, it removes language indicating that the 2020 Rule established a ceiling for NEPA procedures. *See* 87 Fed. Reg. at 23460–61 (discussing the removal of the ceiling provisions at 40 C.F.R. § 1507.3). CEQ represents that the removal of the ceiling language means that, now, "federal agencies may adopt and implement NEPA procedures that require additional or more specific analysis than called for by the CEQ regulations." 28(j) Letter at 1, *Wild Va. v. Council on Env't Quality*, No. 21-1839 (4th Cir. Oct. 12, 2022). Further, the 2022 Rule advises that "agencies can and should continue to apply their existing NEPA procedures, consistent with the CEQ regulations in effect, while CEQ completes its review of and revisions to the 2020 regulations in its Phase 2 rulemaking." 87 Fed. Reg. at 23461.

Second, the 2022 Rule revises "the requirement [at 40 C.F.R. § 1502.13] for a purpose and need statement in an environmental impact statement" and "makes a conforming edit to the definition of 'reasonable alternatives' in 40 [C.F.R. §] 1508.1(z)." *Id.* at 23453. Finally, the 2022 Rule "revis[es] the definition of 'effects' in [40 C.F.R. § 1508.1(g)] to include direct, indirect, and cumulative effects." *Id.*

13

II.

We review a dismissal for lack of jurisdiction de novo. *See Ali v. Hogan*, 26 F.4th 587, 595 (4th Cir. 2022) (standing); *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 190 (4th Cir. 2018) (ripeness and mootness).

A.

As a preliminary matter, although the parties and the district court have focused on standing and ripeness, intervening events—specifically, CEQ's recent promulgation of the 2022 Rule—raise the potential for mootness. Because mootness implicates our Article III jurisdiction, we have an obligation to address it sua sponte. *Castendet-Lewis v. Sessions*, 855 F.3d 253, 260 (4th Cir. 2017).

Plaintiffs' complaint alleged that the 2020 Rule "eliminate[d] entirely any requirement to consider the cumulative effects of an action" and "eliminate[d] the distinction between 'direct' and 'indirect' effects." J.A. 171 (citing 85 Fed. Reg. at 43343). Nearly all of their declarants expressed concerns about these changes.

But the 2022 Rule reverted to precisely the same pre-2020 language as to "direct" and "indirect" effects. *Compare* 40 C.F.R. § 1508.8 (2019), *with* 40 C.F.R. § 1508.1(g)(1)–(2) (2022). And it adopted substantially the same definition of "cumulative" effects as the pre-2020 rule. *Compare* 40 C.F.R. § 1508.7 (2019), *with* 40 C.F.R. § 1508.1(g)(3) (2022). It also eliminated language about causation that Plaintiffs objected to in the 2020 Rule. *Compare* 40 C.F.R. § 1508.1(g)(2) (2020), *with* 40 C.F.R. § 1508.1(g) (2022).

Similarly, Plaintiffs' complaint (and several declarants) expressed concern about "a new definition of 'reasonable alternatives' that prioritizes the goals of the applicant over

14

the public interest." J.A. 172. But again, the 2022 Rule has removed the disputed language. *Compare* 40 C.F.R. § 1508.1(z) (2020), *with* 40 C.F.R. § 1508.1(z) (2022). In light of these changes, Plaintiffs agreed at oral argument that some parts of their challenge were moot, because they had received the relief they sought. We conclude that Plaintiffs' challenges to the 2020 Rule regarding direct, indirect, and cumulative effects, and reasonable alternatives to the extent they were to prioritize the goals of the applicant, are moot in light of the 2022 Rule.

We also asked the parties whether we should hold the remainder of the case in abeyance pending CEQ's Phase 2 rulemaking, since Phase 2 could moot additional aspects of this case. But Plaintiffs urged us not to do so, because they contend that they continue to be harmed by the 2020 Rule while CEQ engages in a lengthy rulemaking process that may not give them all the relief they seek. Accordingly, we proceed to consider Plaintiffs' appeal.

B.

The district court dismissed Plaintiffs' claims on ripeness and standing grounds. *Wild Va.*, 544 F. Supp. 3d at 642. We affirm, primarily on the basis that the claims are not ripe.

"The doctrine of ripeness arises from the case or controversy requirement of Article III." *Whitaker v. Monroe Staffing Servs., LLC*, 42 F.4th 200, 206 (4th Cir. 2022). For that reason, it "presents the threshold question whether a claim is justiciable." *Id.* "The plaintiff bears the burden of establishing ripeness." *Id.* Thus, while we have a burden to *address* Article III jurisdiction sua sponte, the burden remains on Plaintiffs to *demonstrate* that the

15

claim is ripe. *Cf. Renne v. Geary*, 501 U.S. 312, 316 (1991) ("We presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record. It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." (citation and internal quotation marks omitted)). And where Plaintiffs have failed to raise an argument in their opening brief, they have waived it. *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

While standing involves "the question[] of *who* may sue," ripeness involves "*when* they [may] sue." *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (emphases added) (quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)). Of course, "in practice[,] there is an obvious overlap between" these two questions. *Id.* (quoting *Miller*, 462 F.3d at 319); *see also, e.g.*, *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (per curiam); *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013).

However, the two doctrines differ in terms of the evidence we may consider to answer those questions. When evaluating standing, we must look to the facts at the time the complaint was filed. *E.g.*, *Netro v. Greater Balt. Med. Ctr., Inc.*, 891 F.3d 522, 526 (4th Cir. 2018). But "because 'ripeness is peculiarly a question of timing,' we may look to factual developments that occurred after the complaint was filed to determine whether [the plaintiff]'s claims were ripe for review at the time of the district court's judgment."[4]

---

[4] As some of our sister circuits have recognized, this principle "is in seeming tension with the venerable rule that 'the jurisdiction of the [c]ourt depends upon the state of things at the time of the action brought.'" *DM Arbor Ct., Ltd. v. City of Houston*, 988 F.3d 215,

*Whitaker*, 42 F.4th at 208 (quoting *Blanchette v. Conn. Gen. Ins. Corps.* (*Regional Rail Reorganization Act Cases*), 419 U.S. 102, 140 (1974)); *see also Deal*, 911 F.3d at 187, 191 (contrasting standing with mootness and ripeness on this point). So we must determine whether Plaintiffs had shown that their claims were ripe by the time of the district court's decision in June 2021, or if not, whether they have pointed to subsequent factual developments that justify remanding the case for further factfinding related to ripeness. *E.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 869 F.3d 286, 290–91 (4th Cir. 2017) (remanding for jurisdictional discovery related to mootness); *Am. Humanist Ass'n v. Greenville Cnty. Sch. Dist.*, 652 F. App'x 224, 230 (4th Cir. 2016) (unpublished but orally argued)

219 (5th Cir. 2021) (quoting *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824)); *see Progressive Mountain Ins. Co. v. Middlebrooks*, 805 F. App'x 731, 734–36 (11th Cir. 2020) (per curiam). Some courts have sought to reconcile these principles by suggesting that the case law upholding the ability for cases to ripen after the complaint is filed is grounded in *prudential*, rather than constitutional, ripeness. *E.g.*, *DM Arbor Ct.*, 988 F.3d at 220. But others, including this Court, have continued to allow cases to ripen after filing, even when the matter is framed in constitutional terms. *E.g.*, *Whitaker*, 42 F.4th at 206, 208–09; *Church of Our Lord & Savior Jesus Christ v. City of Markham*, 913 F.3d 670, 676–77 & n.6 (7th Cir. 2019). Wright and Miller's authoritative treatise states the same. 13B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3532.7 (3d ed. 2008 & Supp. 2022) ("Ripeness should be decided on the basis of all the information available to the court. Intervening events that occur after decision in lower courts should be included, just as must be done with questions of mootness." (footnotes omitted)). Accordingly, we follow our precedent in this case. We note, however, that in practice, a plaintiff pursuing a claim that is unripe at the time of filing may well have difficulty establishing standing, which is evaluated based on the facts at the time of filing. Anticipated future injury can support standing, but only when it is "certainly impending" or at least poses a "substantial risk"—it must not be "too speculative" or "rel[y] on a highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401, 410, 414 n.5 (2013); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *cf. South Carolina*, 912 F.3d at 730.

17

(remanding "for jurisdictional discovery" related to standing (citing *Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1024 (D.C. Cir. 1998))).

"A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996)). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Id.* (quoting *Miller*, 462 F.3d at 319); *see South Carolina*, 912 F.3d at 730 ("[A] plaintiff's claim is not ripe for judicial review 'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013))); *accord Trump*, 141 S. Ct. at 535. And "[w]here an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court." *Doe*, 713 F.3d at 758.

"In reviewing a ripeness claim, we consider (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Deal*, 911 F.3d at 191 (internal quotation marks omitted); *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998) (describing the considerations as "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts

would benefit from further factual development of the issues presented").[5] At bottom, "the purpose of the ripeness doctrine is 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *South Carolina*, 912 F.3d at 730 (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

As noted, Plaintiffs attached fifty-three declarations from their members to various filings below in an effort to establish standing and ripeness. All but one were filed *before* the 2020 Rule took effect. To be sure, ripeness can rest on anticipated future injury. But as discussed, the future injury cannot be wholly speculative or "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *South Carolina*, 912 F.3d at 730 (internal quotation marks omitted); *see Doe*, 713 F.3d at 758.

Having thoroughly reviewed the declarations Plaintiffs provided to support their claims, we separate their alleged injuries into four categories. Plaintiffs claim that the 2020 Rule will (1) create problems with NEPA analyses, (2) pose obstacles for them to comment on NEPA analyses or otherwise participate in agency decisionmaking, (3) make it more

---

[5] The Supreme Court has since labeled these factors as "'prudential ripeness' factors" and questioned "the continuing vitality of the prudential ripeness doctrine." *Susan B. Anthony List*, 573 U.S. at 167. Nevertheless, both this Court and the Supreme Court have continued to apply them. *E.g.*, *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 188 (4th Cir. 2021); *Trump*, 141 S. Ct. at 536.

19

difficult for them to obtain information about proposed federal actions, and (4) eliminate some categories of actions from NEPA review altogether. We consider each purported injury in turn and conclude we lack jurisdiction as to all of them.

i.

Plaintiffs' declarants first alleged numerous concerns with how NEPA analyses will be conducted under the 2020 Rule. They expressed fears that agencies might no longer properly consider reasonable alternatives to the proposed federal action, and Plaintiffs contend that not all such fears have been mooted by the 2022 Rule. They noted a concern with agencies no longer being required to gather new data or otherwise consider up-to-date data, fearing that this will lead to uninformed decisionmaking. They articulated fears that agencies will move forward with projects before the NEPA analysis is complete, or will allow companies to do so. They worried that agencies will no longer consider a variety of factors, including climate change, environmental justice, the intensity of a project's impact, and the impact of timber sales on the community and local economy.[6] Plaintiffs' comments on the 2020 proposed rule also expressed concern about changes to the understanding of "whether the effects of a proposed action are 'significant.'" J.A. 1078. And, in general,

---

[6] Some of these factor-related concerns may have been mooted by the 2022 Rule. For example, climate change has often been addressed through the consideration of indirect and cumulative effects. *E.g.*, David R. Wooley & Elizabeth M. Morss, *Clean Air Act Handbook: A Practical Guide to Compliance* § 10:33 (32d ed. 2022) (noting that the 2022 Rule's return to requiring the consideration of direct, indirect, *and* cumulative effects was "expected to . . . facilitate assessment of climate change and other impacts"). But we need not rely on mootness because, in any event, the asserted injuries are not ripe.

numerous declarants were afraid that NEPA reviews would be less robust, including as to specific pending projects.

The problem for Plaintiffs is that injuries that are "contingent upon a decision to be made by a third party that has not yet acted" are not ripe. *Doe*, 713 F.3d at 758. CEQ's regulations provide rules for other agencies, but it is those other agencies that will actually take actions subject to NEPA reviews. So to the extent Plaintiffs express fears related to how other agencies will conduct their NEPA reviews of potential future actions after the 2020 Rule, those fears have not yet ripened into actionable injuries.[7] That is particularly so now that the 2022 Rule has removed the 2020 Rule's ceiling provision; CEQ has extended the deadline for other agencies to promulgate rules pursuant to the 2020 Rule until September 2023; and CEQ has advised other agencies that they "can and should continue to apply their existing NEPA procedures, consistent with the CEQ regulations in effect," during the Phase 2 rulemaking process. 87 Fed. Reg. at 23461; *cf. Trump*, 141 S. Ct. at 536 ("Letting the Executive Branch's decisionmaking process run its course not only brings more manageable proportions to the scope of the parties' dispute, but also ensures that we act *as judges*, and do not engage in policymaking properly left to elected representatives. And in the meantime the plaintiffs suffer no concrete harm from the challenged policy

---

[7] For the first time in their reply brief, Plaintiffs point to several ongoing projects that are using the 2020 Rule, some of which occurred before they filed their opening brief, and some of which had not yet led to final agency actions when they filed their reply brief. To the extent the agencies issued final agency actions while briefing was under way in this Court, such that Plaintiffs could properly raise them for the first time in their reply brief, Plaintiffs only glancingly suggest how they were harmed by those actions. We thus deem those arguments waived. *Grayson O*, 856 F.3d at 316 (parties must develop arguments, not merely take "passing shot[s]" at them).

21

itself, which does not require them to do anything or to refrain from doing anything." (internal quotation marks and citations omitted)).

The Supreme Court's decision in *Ohio Forestry Ass'n v. Sierra Club* is instructive. In that case, the plaintiff challenged a federal land and resource management plan adopted by the United States Forest Service. *Ohio Forestry Ass'n*, 523 U.S. at 728. The plan was a necessary, but not sufficient, step for actual logging to occur; "in its absence logging could not take place," but "[the plan did] not itself authorize the cutting of any trees," and a number of further steps were required before logging could take place. *Id.* at 729–30. The Supreme Court held that the plaintiff's claim was not yet ripe.

The Court noted that "the provisions of the Plan that the [plaintiff] challenges . . . do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations." *Id.* at 733. In sum, "the Plan does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut." *Id.* Because there were many steps that would need to occur between the adoption of the Plan and any actual environmental harm, the plaintiff would "have ample opportunity later to bring its legal challenge at a time when harm [was] more imminent and more certain." *Id.* at 734. And "[a]ny such later challenge might also include a challenge to the lawfulness of the present Plan if (but only if) the present Plan then matters, *i.e.*, if the Plan plays a causal role with respect to the future, then-imminent, harm from logging." *Id.* The Court also noted that, under the statute at issue in *Ohio Forestry*, "Congress has not provided for preimplementation judicial

22

review of forest plans," which made those plans "unlike agency rules that Congress has specifically instructed the courts to review 'preenforcement.'" *Id.* at 737.

The same principles apply here. Plaintiffs are ultimately concerned with the environmental effects of decisions that other agencies *might* make in conducting their NEPA analyses under CEQ's 2020 Rule.[8] But there are many steps to occur between the promulgation of the 2020 Rule and any such ultimate environmental harm, including, most importantly, that other agencies will need to actually engage in NEPA reviews (or decline to do so) as to particular projects. And, just as in *Ohio Forestry*, "Congress has not provided for preimplementation judicial review of" NEPA regulations. *Id.*; *see Wild Va.*, 544 F. Supp. 3d at 635. Plaintiffs can bring a challenge to later agency actions—and, if relevant, to the underlying 2020 Rule—"at a time when harm is more imminent and more certain." *Ohio Forestry Ass'n*, 523 U.S. at 734; *see Wild Va.*, 544 F. Supp. 3d at 635 (noting that "[c]ourts have often reviewed challenges to an agency's failure to prepare an [environmental impact statement] and other [as-applied] claims seeking to compel an agency to fully comply with its NEPA obligations," and collecting cases); *cf. Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967) ("We believe that judicial appraisal . . . is likely to stand on a much surer footing in the context of a specific application of this

---

[8] Plaintiffs contend that they are also harmed by their alleged deprivation of NEPA procedural rights. "But deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). So we look to the concrete interests they assert to be harmed by the procedural changes.

regulation than could be the case in the framework of the generalized challenge made here.").

We note that *Ohio Forestry* contains a sentence about which the parties have had much disagreement. In dicta, the Supreme Court wrote that "a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." *Ohio Forestry Ass'n*, 523 U.S. at 737. But in citing "NEPA procedure," the Supreme Court was specifically referring to "an environmental impact statement prepared pursuant to NEPA" and stating that *a challenge to an improperly prepared environmental impact statement* would be ripe. *Id.*; *e.g.*, *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1167, 1174–75 (11th Cir. 2006) (applying *Ohio Forestry* and concluding that challenges to several environmental impact statements were ripe). That is not the challenge Plaintiffs bring here. So, even if we assume (without deciding) that Plaintiffs are entities "with standing," the *Ohio Forestry* dicta provides no assistance to Plaintiffs in this case. *See Wild Va.*, 544 F. Supp. 3d at 634–35.

Indeed, this case is several steps removed from the type of *specific* agency action related to a *specific* project seemingly contemplated by *Ohio Forestry*'s statement. *See Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 32 (1st Cir. 2007) (applying *Ohio Forestry* to find a challenge ripe as to approval of lease of tribal land); *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 45, 49–51 (D.C. Cir. 1999) (applying *Ohio Forestry* to approval of lease of National Forest land and finding challenge ripe as to violations of the agency's *own* regulations, while concluding NEPA challenge was unripe because the plaintiff "brought its NEPA action before any leases had actually been

24

issued"); *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 481 (D.C. Cir. 2009) (noting that *Ohio Forestry* does "not resolv[e] the point at which . . . a violation would occur").

And while some sister circuits have broadened *Ohio Forestry*'s reference to "the NEPA procedure" to include *facial challenges* to a categorical exclusion promulgated by the Forest Service, *see Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947, 949, 952–53 (7th Cir. 2000), to a Forest Plan Amendment, *see Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1168 (9th Cir. 2011) (per curiam); *id.* at 1179 n.2 (Fisher, J., separate opinion representing the opinion of the Court on this issue), or to an agency's "fail[ure] to comply with the procedural requirements of the [Endangered Species Act] when [the agency] declined to reinitiate consultation [with another agency]," *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1084 (9th Cir. 2015), we do not have even that level of specificity here. The promulgation of a categorical exclusion or forest plan by the agency that will enforce it, or the failure of an agency to consult with another agency on a particular matter, is a much more definitive action than the promulgation of floor-setting principles that will guide future NEPA analyses to be performed by other agencies. *Cf. Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("[A] regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the [Administrative Procedure Act] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.").

25

Accordingly, Plaintiffs' claims related to potential flaws in future NEPA analyses are unripe.

ii.

Next, Plaintiffs' declarants raised concerns about their ability to comment on proposed federal actions or participate in the NEPA process after the 2020 Rule. They identified the 2020 Rule's heightened specificity requirements for public comments, which they alleged could mean their comments would be ignored; that commenting would be less effective; that they would have to divert resources to hire experts to write comments; or that they would not be able to afford to do so, precluding them from commenting altogether. *See* 40 C.F.R. § 1503.3. They asserted that the 2020 Rule would permit agencies to hold public hearings online, which they stated would "diminish [their] ability to gather and be heard," especially because some households in their areas lacked internet access. J.A. 574. And they claimed that the 2020 Rule would allow agencies to impose expensive bonds if a group sought to stay an activity, like a timber sale, pending judicial review of the agency's compliance with NEPA, which some declarants asserted would harm them because they would be forced to divert financial resources to post such bonds. In their opening brief, Plaintiffs also note that the 2020 Rule "removes the requirement that agencies respond substantively to all comments," making this optional instead. Opening Br. at 31 (citing 40 C.F.R. § 1503.4(a)).

Again, however, we lack jurisdiction to consider these purported injuries. Concerns about agencies' choices related to bonds, hearings, and responses to comments are

26

speculative until those third parties take such actions or at least demonstrate some imminent likelihood of doing so. *Doe*, 713 F.3d at 758. So those challenges are unripe.

As for the 2020 Rule's heightened specificity requirements for comments on NEPA actions, we recognize that the 2022 Rule's removal of the 2020 Rule's ceiling provision may not eliminate concerns about those requirements. Agencies have to abide by the CEQ regulations, *see* 40 C.F.R. § 1507.1, and the specificity requirements remain in place.[9] Further, those requirements will apply directly to Plaintiffs if and when they submit comments on proposed agency actions, which they plainly intend to do. So Plaintiffs' challenges to those requirements might be ripe. *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 464 (D.C. Cir. 2006) (facial challenge to regulation by regulated party was ripe because "[t]he legality *vel non* of the two challenged features [of the regulation] will not change from case to case or become clearer in a concrete setting").

We do not resolve the ripeness issue as to Plaintiffs' comment-based claims, however, because even assuming those claims are ripe, Plaintiffs lack standing to assert them. Certainly, a plaintiff has standing where they allege that "but for . . . allegedly unlawful abridged [notice-and-comment] procedures they would have been able to oppose [a particular] project that threatened to impinge on their concrete plans to observe nature in [a] specific area." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). But the

---

[9] We note, however, that counsel for CEQ represented at oral argument that the removal of the ceiling provision meant that agencies *could* promulgate less strict commenting regimes than the one called for by the 2020 Rule. Whether that is true is a question for another day.

concreteness of the affected interest is critical. "[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Id.* at 496.

Thus, in *Summers v. Earth Island Institute*, the Supreme Court concluded that the plaintiffs lacked standing even though they argued that "they ha[d] suffered [a] procedural injury, namely, that they ha[d] been denied the ability to file comments on some Forest Service actions and [would] continue to be so denied." *Id.*; *accord Int'l Brotherhood of Teamsters v. Transp. Sec. Admin.*, 429 F.3d 1130, 1135 (D.C. Cir. 2005) ("[T]he 'mere inability to comment effectively or fully, in and of itself, does not establish an actual injury.'" (quoting *United States v. AVX Corp.*, 962 F.2d 108, 119 (1st Cir. 1992))). To establish standing, Plaintiffs would have to point to a specific project as to which the new commenting rules impacted their interests. But they failed to do so. Plaintiffs have not pointed to a single agency action they desired to comment on but were unable to because of the 2020 Rule, or where they diverted resources in order to prepare comments in accordance with the 2020 Rule. They thus lack standing to challenge the commenting requirements based on the present record.

iii.

Third, Plaintiffs contend that under the 2020 Rule, they will face difficulties in obtaining the information they previously received through NEPA, which will harm their advocacy efforts and reduce their ability to weigh in on agency actions. Because of this, Plaintiffs' declarants stated that they would have to divert resources to gather their own data, hire experts, file information requests such as through the Freedom of Information

28

Act ("FOIA"), or pursue litigation. Some stated that they would not be able to afford to do these things or expressed fears that there would not be time to obtain the necessary information through these alternative means within the short comment periods.

The declarants were particularly concerned about FOIA requests, which they stated can take months or even years to process and can be nonresponsive or include incomplete or redacted information, requiring further requests and thus creating further delays. As a precaution against those delays, six declarants noted that they had already filed FOIA requests in the summer of 2020—before the 2020 Rule took effect and, in one instance, before Plaintiffs filed the complaint in this case.

These claimed injuries are unripe for the same reasons noted above: they hinge on future decisions by third parties (other agencies) that may or may not come to pass. Except where actions have been removed entirely from NEPA review—a matter discussed below—the degree to which Plaintiffs will or will not receive information through NEPA will depend on how other agencies interpret and apply CEQ's regulations and what implementing regulations those other agencies promulgate. That is, in light of the 2022 Rule's revocation of the 2020 Rule's ceiling provisions, each agency will have the opportunity—with a current September 2023 deadline—to determine what information it will provide through the NEPA process, with the CEQ regulations providing a floor rather than a ceiling. In the meantime, the 2022 Rule advises that "agencies can and should continue to apply their existing NEPA procedures, consistent with the CEQ regulations in effect, while CEQ completes its review of and revisions to the 2020 [Rule]." 87 Fed. Reg. at 23461. So which precise information Plaintiffs will *not* receive is a matter of speculation

29

at this point. *Cf. Doe v. Pub. Citizen*, 749 F.3d 246, 264 (4th Cir. 2014) (noting that plaintiffs who could show an informational injury for standing purposes normally "(1) alleged a right of disclosure; (2) petitioned for access to the concealed information; and (3) *were denied the material* that they claimed a right to obtain" (emphasis added)).

Even assuming Plaintiffs' 2020 filing of FOIA requests was enough to ripen this injury, they run headlong into a separate jurisdictional problem: standing. The Supreme Court has held that plaintiffs "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). In *Clapper v. Amnesty International*, this meant that the plaintiffs—"attorneys and human rights, labor, legal, and media organizations whose work allegedly require[d] them to engage in sensitive and sometimes privileged telephone and e-mail communications with colleagues, clients, sources, and other individuals located abroad"—could not challenge the constitutionality of a surveillance law, even though they strongly suspected that some of their contacts and clients could be subject to that law and altered their behavior accordingly, such as by flying abroad to have in-person conversations. *Id.* at 406; *see id.* at 402, 407.

So too here. Plaintiffs may fear that they will not receive the information in question, but they cannot create standing in advance by altering their behavior in reaction to that fear—here, by filing FOIA requests for information they may well still receive through the NEPA process. *Cf. Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017) (no standing where the plaintiffs had filed

30

FOIA requests but had not shown that the defendant's actions caused them to file those requests).

iv.

Finally, Plaintiffs raise concerns about specific types of projects that may be or will certainly be categorically excluded from NEPA review. Although their declarants noted a number of projects they *feared* would no longer undergo NEPA review, those fears are speculative and depend on other agencies' future decisions. They thus are not yet ripe.

On appeal, Plaintiffs have chosen to focus instead primarily on two specific categories of projects that are definitively exempt from NEPA review after the 2020 Rule or related rulemaking: Concentrated Animal Feeding Operations ("CAFOs") and certain timber harvests.

CAFOs are large-scale livestock operations in which significant numbers of animals, such as "hog[s] and poultry," are bred and raised in cramped conditions. J.A. 463. CAFOs can create air and water pollution for the surrounding area, in addition to other problems. *See* J.A. 407, 463, 639–41; *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 977–84 (4th Cir. 2020) (Wilkinson, J., concurring).

According to Plaintiffs' declarants, prior to the 2020 Rule, CAFOs' applications for federal loan guarantees were subject to NEPA review as "major federal actions." *See* J.A. 612 ("Federal loan guarantees have been the primary trigger for NEPA review of CAFOs."). But the 2020 Rule provided that federal loan guarantees are no longer to be considered "major federal actions" and thus are no longer subject to NEPA review. And while the 2022 Rule eliminated the ceiling provision, agencies still must abide by the 2020

31

Rule at least as a floor, which suggests that the 2020 Rule's elimination of federal loan guarantees from NEPA review remains valid.[10] Plaintiffs' declarants expressed concerns that this regulatory change would spur the development of CAFOs, leading to pollution that would affect their health, recreational interests, and businesses.

But whether the exemption of those CAFOs that sought federal loan guarantees from NEPA review will spur the development of CAFOs, and will do so in geographic areas impacting Plaintiffs' members, is entirely speculative. Plaintiffs supply no data as to what percentage of new CAFOs receive such loan guarantees, "and the decision whether to seek such loan guarantees presumably rests with the nongovernmental third-party entities who aim to build the CAFOs." *Wild Va.*, 544 F. Supp. 3d at 638 n.8. Nor do Plaintiffs point to any evidence that removing the barrier of NEPA review is likely to lead to a proliferation of CAFOs. So instead, their claim to ripeness must rest on the *procedural* and *informational* injuries associated with the removal of CAFOs from the NEPA process.

Yet administrators for both agencies involved in CAFO-related federal loan guarantees—the Department of Agriculture's Farm Service Agency and the Small Business Administration—submitted declarations before the 2020 Rule's effective date asserting that until their agencies finalized new rules, they would "maintain the *status quo* and not change the current level of NEPA analysis" applied to CAFOs. J.A. 711. Plaintiffs note that it is odd for agency officials to submit declarations stating an intent not to follow

---

[10] However, counsel for CEQ represented at oral argument that with the elimination of the ceiling rule, agencies could continue to perform NEPA reviews for CAFOs, notwithstanding the 2020 Rule.

32

the law. If indeed the agencies are acting in contradiction to binding regulations, they may be opening themselves up to a lawsuit from a different plaintiff. But the agencies' decision to continue to apply the regulations in effect before the 2020 Rule accords with the relief Plaintiffs seek here. And Plaintiffs have pointed to no evidence that the agencies are not conducting NEPA reviews related to CAFOs. Accordingly, on the record before us, Plaintiffs' challenge is unripe.

That leaves the timber harvests. According to Plaintiffs' opening brief, two agencies—the Forest Service and the Bureau of Land Management—have used the 2020 Rule to issue categorical exclusions authorizing timber harvests. Opening Br. at 9 n.3 (citing National Environmental Policy Act (NEPA) Compliance, 85 Fed. Reg. 73620, 73632 (Nov. 19, 2020); National Environmental Policy Act Implementing Procedures for the Bureau of Land Management (516 DM 11), 85 Fed. Reg. 79517, 79518 (Dec. 10, 2020)). But Plaintiffs failed to articulate how imminent any such harvests are or how regulations that were promulgated in November and December 2020 were likely enough to have posed even a "substantial risk" of injury so as to have supported standing at the time they filed their lawsuit in July 2020. *Clapper*, 568 U.S. at 414 n.5; *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). They have thus waived any jurisdictional argument based on those harvests.[11] *Grayson O,* 856 F.3d at 316.

---

[11] For the same reason, we do not address the concern expressed by several declarants—but not mentioned by Plaintiffs on appeal—that the 2020 Rule will "impede the growth of the solar industry by creating uncertainty for solar farm developers." J.A. 261.

C.

Our conclusions lead to one final question: should we remand the case for further factfinding related to ripeness? We decline to do so here. Plaintiffs have not asked for that remedy; they appear to have been operating under the misunderstanding, shared by CEQ, that ripeness is assessed at the time the complaint is filed. Indeed, Plaintiffs have insisted that "there is no further administrative or factual development that could affect the validity of Plaintiffs' claims." Opening Br. at 42–43.

D.

Before closing, we pause to emphasize the limited nature of our holding. We do not hold that Plaintiffs may never challenge the 2020 Rule—only that they may not do so based on the record and arguments they put before us in this case. CEQ readily concedes that Plaintiffs will be able to challenge the 2020 Rule "in the context of specific projects if and when a final decision that threatens actual imminent harm to [P]laintiffs or their members occurs." J.A. 877; *see Wild Va.*, 544 F. Supp. 3d at 635 n.6. Nor do we hold that plaintiffs going forward will have to wait until they have actually suffered an environmental injury before they may sue. That is not the law of ripeness. *Cf. Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 160 (4th Cir. 2000) (en banc) (noting, in discussing standing, that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief" (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979))). Rather, as we have noted, ripeness may be satisfied by a future injury, as long as that future injury is "not dependent on future uncertainties." *Doe*, 713 F.3d at 758.

34

Plaintiffs argue that forcing them to litigate their claims one project at a time will be time- and resource-intensive, for them and for the courts. Certainly, it would be more efficient for the parties and the courts if we could adjudicate the 2020 Rule in one preemptive fell swoop. But such efficiency concerns cannot generate jurisdiction. *See Ohio Forestry Ass'n*, 523 U.S. at 735 ("[T]he Court has not considered this kind of litigation cost saving sufficient by itself to justify review in a case that would otherwise be unripe."). And again, we are not saying that Plaintiffs will be unable to challenge the 2020 Rule at all. *See South Carolina*, 912 F.3d at 731 ("That . . . claims are not currently justiciable does not mean that they never will be so."). They just will need to bring such a challenge under circumstances where they can present evidence sufficient to support federal-court jurisdiction.

## III.

For the reasons expressed, we affirm the district court's dismissal of Plaintiffs' claims for lack of jurisdiction.

*AFFIRMED*

35